# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### LAFAYETTE DIVISION

<table>
<tr><td>PHILLIP GUERNSEY</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>vs.</td><td>)</td><td>NO. 4:13-CV-00086</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>CITY OF LAFAYETTE.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendant.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

## OPINION AND ORDER

This matter is before the Court on the Defendant's Motion for Summary Judgment, filed by Defendant City of Lafayette ("City") on May 11, 2015 (DE #31), and Plaintiff Phillip Guernsey's ("Guernsey") Motion for Summary Judgment on Defendant's Liability under Count 3, filed on May 11, 2015 (DE #33). For the reasons set forth below, the City's motion for summary judgment (DE #31) is **GRANTED,** and Guernsey's motion for summary judgment (DE #33) is **DENIED.** The Clerk is **ORDERED** to **DISMISS** this case **WITH PREJUDICE.**

BACKGROUND

On February 1, 2013, the City terminated Guernsey's employment as a laborer in its Street Department, stating that its decision was based on Guernsey's history of taking excessive

amounts of sick leave. Guernsey filed this action against the City, asserting that he was wrongfully terminated in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1161 *et seq*. The City denies that Guernsey's termination was wrongful, or that it violated the ADA, FMLA, or COBRA. Both the City and Guernsey filed motions for summary judgment. The motions have been fully briefed and are ripe for adjudication.

DISCUSSION

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. To determine whether a genuine dispute of material fact exists, the Court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences

in that party's favor.  *See Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010).

A party opposing a properly supported summary judgment motion may not rely on allegations in his own pleading but rather must "marshal and present the court with the evidence [he] contends will prove [his] case." *Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010).  "[I]nferences relying on mere speculation or conjecture will not suffice." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (citation omitted).  If the nonmoving party fails to establish the existence of an essential element on which he bears the burden of proof at trial, summary judgment is proper. *See Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

Facts

Guernsey began working as a laborer in the City's Sanitation Department in 1984.  In 1985, he was pinned between a sanitation truck and a building, which injured his lower back.  Over the next few years, Guernsey had several other on-the-job injuries, including injuries to his back and knee, for which he received treatment under workers compensation.  In 1990, doctors recommended that Guernsey be reassigned to another position because his knee pain was aggravated by the high steps required to collect trash.  The City reassigned Guernsey to the Street Department, where he worked as a laborer for approximately three

years.  Guernsey requested and received a transfer to the Fleet Maintenance Department, but after Guernsey "missed a couple of days" of work, the department supervisor transferred Guernsey back to the Street Department.  (DE #34-16 at 9.)

Guernsey's job duties as laborer in the Street Department included picking up brush, leaves, and large items, and patching and paving streets.  The job required that Guernsey be on-site to perform his duties; it could not be performed from his home. Guernsey testified that he was able to perform his duties as laborer, even with his prior injuries.  He never told his supervisors that he could not perform a job assignment.  He admits that while he "never turned down a job assignment," he "would sometimes need a short time off work if [he] overexerted [himself], in order to recover."  (DE #41 at 5.)  Each day, the Street Department supervisors prepared a list of job assignments to be completed the following day, and assigned employees to those assignments.  Whenever Guernsey called in sick, the supervisor would "switch people around," and other employees would "cover" his job assignments.  (DE #34-16 at 21.)

Guernsey's Injuries

Between 1990 and 2012, Guernsey reported twelve on-the-job injuries, including injuries to his back and knee, which were all treated under workers compensation.  By the mid-1990s, Guernsey had been diagnosed with chronic knee, shoulder, and back pain,

degenerative disc disease, spurring in the spine, and narrowing of the spine. These conditions limit his ability to walk long distances, run, lift, stand, bend, stoop, and climb stairs. Guernsey's position as laborer did not require him to climb stairs or walk long distances. His position occasionally required him to stoop, lift, bend, or sit or stand for long periods of time. Guernsey admits that he never had a problem with completing his job duties even when they included stooping, bending, lifting, or standing for a long period of time. Guernsey experienced back soreness almost every time after he worked the blacktop machine, and every time after he sealed cracks in the street. He also experienced soreness in his back and shoulder after collecting bags of grass clippings. Guernsey had no way to predict which days he would need to call in sick because of soreness.[1]

The last injury Guernsey reported to the City was in May 2012. Guernsey took off work from May 1, 2012, to July 16, 2012, for a knee injury he had incurred in November 2011. On July 16, 2012, Guernsey's doctor reported that Guernsey had "excellent motion, excellent stability, excellent tracking, and excellent strength,"

---

[1] According to the City, Guernsey admitted in his deposition that "no accommodation . . . would have allowed him to perform his job duties on the days he experienced soreness. [Exhibit 30, p. 49 lines 9-18] The only option was to allow Guernsey to sporadically, and unpredictably miss work. [Exhibit 30, p. 49, line 19 - p. 50, line 16]." (DE #32 at 12.) However, the City does not provide the Court with these pages of Guernsey's deposition testimony. (*See* DE #34-16.)

and released him to return to "[f]ull activity with no limitations" with "no need for follow up." (DE #34-18.) Guernsey did not advise the City of any restrictions, limitations, or health conditions between July 16, 2012, and February 1, 2013.

On October 9, 2012, Guernsey underwent a magnetic resonance imaging ("MRI") scan on his lumbar spine. The MRI report dated October 10, 2012, indicates mild to moderate degenerative changes to Guernsey's lumbar spine. (DE #41 at 9-10.)

Sick Leave

The City's Personnel Policy Manual ("City handbook") states that sick leave is a benefit provided "to protect against loss of income during periods of illness/injury." (DE #34-25 at 2.) Regular full-time employees accrue one sick day per month for a maximum of 36 days. The City handbook explains that "[p]atterns of sick leave usage immediately prior to or subsequent to holidays, vacations, days off and/or weekends, as well as excessive sick leave usage may result in sick leave denial and appropriate disciplinary action." (*Id*. at 3.)

Guernsey has a history of sick leave use. In 2009, Guernsey called in sick 11 times, ten of which were around a weekend or vacation day. In 2010, he called in sick 13 times, six of which were around a weekend or vacation day. In 2011, he called in sick 15 times, 13 of which were around a weekend or vacation day. In 2012, he called in sick 11 times, seven of which were around a

weekend or vacation day. (DE #34-17 at 3.) Between 2003 and 2012, Guernsey used an average of 13.3 sick days per year, while all other Street Department employees used an average of 5.6 days per year. (*Id.* at 2.) From 1995 to 2011, Guernsey was reprimanded 12 times for excessive absenteeism and/or improper use of sick leave. Guernsey never exceeded his allotted sick leave.

Guernsey attests that he has chronic conditions that cause him to suffer short-term incapacity from time to time, and for which he periodically sees a health provider. During the last two years of his employment with the City, most of the instances in which Guernsey called in sick were related to his "back issues." (DE #41 at 4.) When he took sick days, Guernsey told his supervisor that he was having "back problems." (*Id.*) When Guernsey visited a doctor on one of his sick days, he took a doctor's note to work. The doctor's notes did not indicate why Guernsey was seen by the doctor or what treatment was provided. Guernsey did not provide the City with additional information, even when his supervisor requested it, "because of the HIPAA laws." (DE #34-16 at 29.) Guernsey understood that, "[u]nless it's a work-related injury[,] your work don't need to know what is wrong with you." (*Id.* at 28.)

FMLA Leave

During Guernsey's employment, "The Federal Complete Compliance Poster" was posted inside the Street Department garage.

The poster included information about the FMLA and other federal employment-related statutes. The poster's "Use of Leave" section states in part that "[a]n employee does not need to use [the FMLA] leave entitlement in one block. Leave can be taken intermittently or on a reduced leave schedule when medically necessary." (DE #34-9.) The City handbook mentions seeking "intermittent leave" under the FMLA, but does not address how such leave is to be used. (DE #41 at 18.)

Guernsey applied for FMLA leave twice while employed by the City. In 2003, he requested and received FMLA leave due to his wife's hospitalization.[2] In 2004, he requested and received FMLA leave due to a wrist injury. Guernsey never requested FMLA leave for chronic pain issues. The City never inquired as to whether Guernsey might qualify for FMLA leave to address his absences.

<u>Termination</u>

On January 16, 2013, Guernsey texted his supervisor that his back was "still bothering" him and that he wanted to take a vacation day. (DE #34-4.) Guernsey's request to take this sick day prompted the Street Department's operations manager to review his absences. The operations manager determined that Guernsey had received repeated warnings related to his absenteeism and had used

---

[2] The parties dispute whether Guernsey took intermittent FMLA leave for his wife's hospitalization in 2003. The Court finds this issue of fact to be immaterial.

more sick leave than any other Street Department employee, and that the majority of his sick days were around a weekend or scheduled vacation day. (DE #34-22 at 1.) The City did not investigate to see what Guernsey was doing during his sick days, nor did it deny him the requested leave or require him to submit additional proof of his need for time off.

On February 1, 2013, the City terminated Guernsey's employment based on "improper uses of sick leave," "[f]ailures to follow established work procedures and policies," and "incident[s] or circumstance[s] which will prevent an employee from being able to fulfill all of his/her duties." (DE #34-21 at 1.) At the meeting informing Guernsey of his termination, the City provided Guernsey with a summary of the incidents, his prior work and disciplinary history, and statistics supporting its conclusion regarding his use of sick leave. Guernsey did not respond with any reason or explanation for his use of sick days at that time. The City did not give Guernsey an exit interview after his termination.

Guernsey challenged his termination of employment, which prompted the Board of Works to hold a grievance hearing. At the hearing, Guernsey's union representative argued that that Guernsey would have taken FMLA leave if he had known he could take it intermittently. The City responded that Guernsey was aware of the FMLA process because he had requested FMLA leave in the past, and

that the City did not have information to suggest that his absences were covered by the FMLA. The Board of Works affirmed Guernsey's termination of employment.[3]

### Continuation of Insurance Coverage

During his employment, Guernsey and his family participated in the City's employee health insurance plan. Due to an oversight, the City did not terminate Guernsey's insurance benefits on the date of his termination of employment. The City continued to pay for health, dental, and vision insurance for Guernsey and his dependents until June 21, 2013. On that date, the City discovered the error and directed the IACT Medical Trust ("IACT") to terminate Guernsey's insurance coverage. IACT "administers the City's benefit plan and is the 'plan administrator.'" (DE #34-17 at 5.) IACT informed United Healthcare of the termination of Guernsey's insurance coverage. On August 26, 2013, United Healthcare sent Guernsey a notice of his right to elect COBRA continuation coverage ("election notice"). The election notice stated a "Qualification Date" of June 21, 2013. (DE #34-12.)

After Guernsey's termination of employment, Guernsey and his wife (the "Guernseys") made numerous attempts to determine when he

---

[3] The parties dispute whether the City offered Guernsey his prior position in the Street Department with back pay and benefits, and whether Guernsey declined the offer. The Court finds these issues of fact to be immaterial for the purposes of the instant motions for summary judgment.

would receive the paperwork for electing continuation of insurance coverage. (DE #33-2 at 1.) Guernsey states that after he received the election notice, he was confused about whether he owed premiums for the February 1, 2013 - June 21, 2013 time period, and that City did not respond to his inquiries about this. Guernsey elected not to maintain health insurance because he "was unable to afford the cost of bringing the payments current so that [his] coverage could be maintained." (*Id.*) Guernsey insists that if he had known that he was not required to pay the health insurance for the February 1, 2013 - June 21, 2013 time period, he would have elected health coverage, and paid the premiums with his unemployment benefits and the assistance of family members.

Guernsey elected to maintain vision and dental insurance, and paid the premiums for this insurance through October 31, 2013. The Guernseys mistakenly believed that this payment provided them with insurance coverage through December 2013. In December 2013, United Healthcare sent Guernsey a bill for an unpaid balance plus a regular monthly premium payment for January 2014 coverage. On January 10, 2014, the Guernseys paid only a portion of the amount due. Three days later, United Healthcare terminated the Guernseys' insurance coverage as of October 31, 2013, for nonpayment.

<u>Analysis</u>

    <u>ADA Claims</u>

Count I of the Amended Complaint alleges that Guernsey was terminated due to his disability in violation of the ADA. Under the ADA, as amended by the ADA Amendments Act of 2008, it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability" in regard to the "discharge of employees." 42 U.S.C. § 12112(a). Guernsey could proceed under either the direct or indirect method of proof to establish his claim. *Hooper v. Proctor Health Care Inc*., 804 F.3d 846, 853 (7th Cir. 2015). "Under the direct method, he must show that (1) he is disabled within the meaning of the ADA, (2) he was qualified to perform the essential functions of the job with or without accommodation, and (3) he was terminated because of his disability." *Id*. (citation omitted). To establish the third prong, Guernsey must show that "his disability was a 'but for' cause of his termination, which can be demonstrated through direct or circumstantial evidence, with circumstantial evidence encompassing, among other things, suspicious timing and pretext for the adverse employment action." *Id*. (citations omitted).

Under the indirect method, Guernsey may create a presumption of discrimination by establishing that "(1) he is disabled within the meaning of the ADA, (2) he was meeting [the City's] legitimate expectations, (3) he suffered an adverse employment action, and

(4) [the City] treated similarly situated, non-disabled employees more favorably." *Id.* (citation omitted). If Guernsey establishes a *prima facie* case, the City must provide "evidence showing a legitimate, nondiscriminatory reason for the employment action." *Id.* (citation omitted). Guernsey must then present evidence demonstrating that the City's stated reason is pretextual. *Id.* (citation omitted).

The City maintains that Guernsey does not allege any direct evidence of discrimination, so is proceeding under the indirect method. The Court agrees. In his response brief, Guernsey does not specifically identify his method of proof, but his argument and supporting case law indicate that he intends to proceed under the indirect method. He argues that issues of fact preclude summary judgment as to whether he can make a *prima facie* case, and maintains that sufficient evidence of pretext exists to avoid summary judgment.[4] In support, Guernsey cites case law addressing the indirect method of proving discrimination. (DE #40 at 11 (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (applying the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct.

---

[4] The Court notes that Guernsey only identifies three elements of a *prima facie* case of ADA discrimination, and omits the fourth element requiring that similarly situated employees were treated more favorably than the plaintiff. (DE #40 at 11 (citing no supporting case law).)

1817, 36 L. Ed. 2d 668 (1973), to an age discrimination claim).)
Guernsey contends that the City's proffered reason for terminating
him was pretextual, and that its true motivation for the
termination was based on Guernsey's need to take such sick leave.
(*Id*. at 12.) While evidence of pretext may support a finding of
circumstantial evidence of discrimination under the direct method
of proof, *see Hooper*, 804 F.3d at 853, Guernsey does not indicate
that he is proceeding under this method. As such, the Court finds
that Guernsey proceeds solely under the indirect method of proof.
To the extent that Guernsey intended to proceed under the direct
method, he has waived such argument by failing to address this
method of proof in his response brief. *See Weber v. Univs.
Research Ass'n, Inc.,* 621 F.3d 589, 593 (7th Cir. 2010) (finding
direct method of proving discrimination waived where plaintiff
mentioned suspicious timing, a class of circumstantial evidence
that could support a direct method argument, but "did nothing more
to indicate to the district court that she was pursuing the direct
method" of proof); *Timm v. Ill. Dep't of Corr.,* 335 Fed. Appx.
637, 642 (7th Cir. 2009) (finding direct method of proving
discrimination waived where plaintiff failed to raise a direct
method argument, even though circumstantial evidence supporting a
direct method theory was presented to the district court).

Under the indirect method of proof, Guernsey must demonstrate
that he is disabled within the meaning of the ADA. The City argues

that it is entitled to summary judgment on Count I because Guernsey was not a qualified individual with a disability at the time of his termination. A "disability" is defined in part as a "physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). The type of "major life activities" that must be substantially limited include "performing manual tasks, . . . walking, standing, lifting, bending, . . . and working." 42 U.S.C. § 12102(2). The term "substantially limits" must be "construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 29 C.F.R. § 1630.2(j)(1)(i). "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). The question is whether an individual is limited "as compared to most people in the general population." *Id.*

The City maintains that Guernsey was not disabled under the ADA because he was not substantially limited in performing one or more major life activities. While the City acknowledges that Guernsey has difficulty with walking, running, lifting, standing, bending, stooping, and climbing stairs, he testified that he could perform any job assigned to him as a laborer in the Street Department. After Guernsey's last reported injury, his doctor opined that Guernsey had "excellent motion, excellent stability,

excellent tracking, and excellent strength," and that he could return to full activity with no limitations and no follow-up on July 16, 2012. The City contends that the back soreness Guernsey experienced after performing certain work activities is not a substantial limitation as compared to most people in the general population.

Guernsey responds that genuine issues of material fact exist as to whether he was disabled under the ADA. He points to the fact that he has had to take work off due to back pain since he was injured in 1985, when he was pinned between a truck and a building. He asserts that the City knew of his back and knee injuries because his initial injuries and follow-up care were handled by workers compensation insurance, and because he informed his supervisor of his back pain when he called in sick. Guernsey proffers medical records from 1990 and earlier, but it is unclear how these records support Guernsey's alleged disability when he was terminated in 2013, given that the records precede his termination by over twenty years. He also proffers an October 2012 MRI report that indicates degenerative changes to Guernsey's lumbar spine. This report was prepared several months after the July 2012 medical opinion that Guernsey had "excellent motion" and could return to full activity without limitations.

It is undisputed that Guernsey has been diagnosed with chronic back and knee pain, degenerative disc disease, spurring in the

spine, and narrowing of the spine, and that these conditions limit his ability to walk, lift, stand, and bend. *See* 42 U.S.C. § 12102(2) (identifying walking, lifting, standing, and bending as "major life activities"). While Guernsey testified that he never turned down a work assignment, he also attests that he "would sometimes need a short time off work if [he] overexerted [himself], in order to recover." (DE #41 at 5.) In light of the expansive scope of the definition of "substantial limitation" of a major life activity, and viewing the facts in the light most favorable to Guernsey, the Court finds that Guernsey has presented a triable issue of material fact as to whether he is disabled under the ADA.

The City also argues that Guernsey was not a "qualified individual" within the meaning of the ADA because he was not able to "perform the essential functions of the employment position" "with or without reasonable accommodation" at the time of his termination. 42 U.S.C. § 12111(8); *see Basden v. Prof'l Transp., Inc.,* 714 F.3d 1034, 1037 (7th Cir. 2013) (whether person is a qualified individual is examined as of the time of the adverse employment decision). The ADA requires an employer to "make reasonable accommodations only if accommodation would permit the disabled employee to perform her job." *Gile v. United Airlines, Inc.*, 213 F.3d 365, 372 (7th Cir. 2000).[5]

---

[5] The City asserts that Guernsey admitted that no accommodation would have allowed him to perform his job duties on the days he

"An employer is generally permitted to treat regular attendance as an essential job requirement and need not accommodate erratic or unreliable attendance." *Basden,* 714 F.3d at 1037 (citing *EEOC v. Yellow Freight Sys., Inc.,* 253 F.3d 943, 948-49 (7th Cir. 2001)). "[I]n most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability." *Kennedy v. United States Postal Serv.*, No. 2:10-CV-0279, 2014 WL 1047820, at *11 (N.D. Ind. Mar. 17, 2014) (quoting *Waggoner v. Olin Corp.,* 169 F.3d 481, 484 (7th Cir. 1999)). Here, it is undisputed that Guernsey must be on-site at work to perform his job duties, and that other employees must cover for Guernsey when he calls in sick. It is also undisputed that Guernsey cannot predict on which days he would need to call in sick due to soreness.

Guernsey insists that genuine issues of material fact exist regarding whether he was able to perform his essential job duties, despite his limitations, because he never turned down an assignment, and "could perform all duties related to his job provided that he was granted occasional time off to recover if overexerted." (DE #40 at 11.) Courts in this circuit have found

---

felt sore. (DE #32 at 23.) However, as noted above, the record does not include this testimony. The Court "will not credit those parts of [the City's] version of the facts that are not supported by any evidence in the record." *Bluestein v. Central Wis. Anesthesiology, S.C.,* 769 F.3d 944, 949 n.1 (7th Cir. 2014).

that it "is unreasonable to expect an employer to tolerate unannounced changes to an employee's schedule for an indefinite period." *Fisher v. Vizioncore, Inc.,* No. Civ. A. 09 C 6853, 2010 WL 4932612, at *4 (N.D. Ill. Nov. 30, 2010) (citing, among others, *Yellow Freight Sys.,* 253 F.3d at 950 (employee's request for "an open-ended, unlimited amount of 'sick days, if needed[,] without being penalized'" was not a reasonable accommodation) (alteration in original) and *Waggoner*, 169 F.3d at 484 (employee's request for "an 'unpredictable' amount of time off from work should her symptoms so demand" was not a reasonable accommodation)). However, courts have also noted that "[t]ime off may be an apt accommodation for intermittent conditions. [For example,] [s]omeone with arthritis or lupus may be able to do a given job even if, for brief periods the inflammation is so painful that the person must stay home." *Kennedy*, 2014 WL 1047820, at *11 (quoting *Byrne v. Avon Prods., Inc.,* 328 F.3d 379, 381 (7th Cir. 2003)). Here, the record indicates that Guernsey took 11 sick days in 2012, and took an average of 13.3 sick days per year between 2003 and 2012, but never exceeded his allotted sick leave. The Court cannot conclude as a matter of law that the number of sick days taken by Guernsey rises to the level of "erratic or unreliable attendance" that an employer "need not accommodate" under the ADA. *Basden,* 714 F.3d at 1037; *cf*. *Yellow Freight Sys.,* 253 F.3d at 946 (employee who called in sick every day for three months, in addition to other absences, in

the year he was terminated was not a "qualified individual" under the ADA); *Waggoner,* 169 F.3d at 482, 484 (employee who missed work or was late for work 40 times in a 14-month period was not a "qualified individual").

However, even if Guernsey was a qualified individual with a disability within the meaning of the ADA, he fails to present a *prima facie* case of discrimination because he does not identify any similarly situated employees who were treated more favorably than him. *Antonetti v. Abbot Labs.,* 563 F.3d 587, 592 (7th Cir. 2009) ("Without a similarly situated employee, Plaintiffs cannot present a *prima facie* case and their claim must fail."). Guernsey does not provide evidence of any other employee with a similar history of sick leave who was not terminated. Nor does the record show that any employee was similarly situated to Guernsey. The only evidence presented regarding other employees shows that between 2003 and 2012, all other Street Department employees used an average of 5.6 sick days per year, while Guernsey used an average of 13.3 sick days per year. No genuine issue of material fact exists as to whether other similarly situated employees were treated more favorably than Guernsey. Because Guernsey fails to make a *prima facie* case of discrimination, the Court need not address the City's stated reason for terminating Guernsey, or whether such reason was pretextual.

Guernsey fails to raise a genuine issue of material fact as to whether similarly situated employees were treated more favorably than he was.  Therefore, the Court grants the City's motion for summary judgment as to Count I.

FMLA Claim

Count II of the Amended Complaint alleges that the City violated the FMLA by firing Guernsey for an absence that qualified as medical leave under the FMLA.  The FMLA allows an eligible employee to take unpaid leave in certain circumstances when the employee becomes unable to perform his job duties due to a "serious health condition."  29 U.S.C. § 2612(a)(1)(D).  To establish a violation of rights under the FMLA, a plaintiff must show that: (1) he was eligible for FMLA protection; (2) his employer was covered by the FMLA; (3) he was entitled to FMLA leave; (4) he provided sufficient notice of his intent to take leave; and (5) his employer improperly denied benefits to which he was entitled. *Ryl-Kuchar v. Care Ctrs*., Inc., 565 F.3d 1027, 1030 (7th Cir. 2009).  The parties do not contest that Guernsey was an eligible employee under the FMLA, that the City is covered by the FMLA, or that Guernsey never requested FMLA leave for his absences due to his back pain. At issue in this case is whether Guernsey suffered from a serious health condition.

Guernsey maintains that he was entitled to FMLA leave because he had serious health conditions involving continuing treatment by

a health care provider that was a chronic condition. A "serious health condition" is defined by the FMLA as "an illness, injury, impairment, or physical or mental condition that involves - (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a healthcare provider." 29 U.S.C. § 2611(11). It is undisputed that Guernsey did not require "inpatient care." Thus, the Court must determine whether evidence exists to show that Guernsey received continuing treatment by a health care provider. A serious health condition involving continuing treatment by a health care provider includes a chronic condition, defined as one which:

> (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;
> (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
> (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.115(c). Leave is qualified for periods of incapacity or for treatment for such incapacity due to a chronic serious health condition. *Id*. "Whether an illness or injury constitutes a 'serious health condition' under the FMLA is a legal question that an employee may not sidestep in the context of summary judgment merely by alleging [his] condition to be so." *Caskey v. Colgate-Palmolive Co.,* 535 F.3d 585, 591 (7th Cir. 2008) (citation omitted).

The City argues that Guernsey's FMLA claim fails as a matter of law because he fails to offer competent medical evidence of his condition on January 16, 2013. According to the City, Guernsey's statement that his back was "bothering" him on January 16, 2013, is insufficient to prove that he was incapacitated on that day. *Bell v. Jewel Food Store*, 83 F. Supp. 2d 951, 959 (N.D. Ill. 2000). However, "[a]bsences attributable to incapacity [due to a chronic serious health condition] qualify for FMLA leave even though the employee . . . does not receive treatment from a health care provider during the absence." 29 C.F.R. § 825.115(f). An employee with a chronic serious health condition might not visit a health care provider during a flare-up of that condition. *Hansen v. Fincantieri Marine Group, LLC,* 763 F.3d 832, 839 (7th Cir. 2014); *see* 29 C.F.R. § 825.115(f) (citing as examples absences due to asthma attacks, severe allergies, and morning sickness). In such case, "[t]here would be no medical testimony about the incapacity on that particular day and the only available evidence to prove incapacity would be lay testimony. Thus, the regulations support the conclusion that incapacity can be established by lay testimony. . . ." *Hansen,* 763 F.3d at 839. Here, Guernsey texted his supervisor that his back was "still bothering" him and requested the day off on January 16, 2013. In his affidavit, Guernsey asserts that he has chronic issues that "cause [him] to suffer short-term incapacity from time to time," that his "back problems"

are permanent or long-term, that he has been under the supervision of a healthcare provider for them, and that most of his absences in the last two years of his employment were related to his "back issues." (DE #41 at 4.) Considering the evidence in the light most favorable to Guernsey, genuine issues of material fact exist as to whether he was incapacitated on January 16, 2013.

The City also contends that Guernsey has not offered evidence of a chronic serious health condition that requires "periodic visits (defined as at least twice a year) for treatment by a health care provider." 29 C.F.R. § 825.115(c). Guernsey attests that he has chronic issues for which he "periodically see[s] a health provider," and that he has "been under the supervision of a health care provider" for his back problems. (DE #41 at 4.) Guernsey proffers an October 2012 MRI report indicating degenerative changes to his lumbar spine, as well as a few medical records from 1988 and 1990. (DE #41 at 7-14.) The record also includes two doctor's notes from 2012 indicating that Guernsey had seen a doctor and could return to work. (DE #34-3 at 1, 8.) While these doctor's notes do not provide information regarding Guernsey's medical condition, his affidavit explains that most of his absences during his last two years of employment related to his back problems. Considering this evidence in the light most favorable to Guernsey, the Court finds that a genuine issue of material fact exists as to

whether Guernsey has a chronic serious health condition that requires periodic visits for treatment by a health care provider.

The City also argues that Guernsey did not provide sufficient information to inform the City that he had an FMLA-qualifying event. Under the FMLA, "[t]he employee's notice obligation is satisfied so long as he provides information sufficient to show that he *likely* has an FMLA-qualifying condition." *Burnett v. LFW Inc.*, 472 F.3d 471, 479 (7th Cir. 2006) (emphasis in original, citation omitted). The pertinent question is whether the employee put the employer on "inquiry notice" that he wanted FMLA-qualifying leave. *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 826 (7th Cir. 2011) (citations omitted). The employee is not required to refer to the FMLA, so long as he alerted the employer to the seriousness of his health condition. *Id.* If the employee provided sufficient notice, then the employer had a duty to inquire further to confirm his entitlement to FMLA leave. *Id.*

The Seventh Circuit has held that an employee's "request for leave coupled with a mention of [his] sickness [does] not place the employer on notice of a probable basis for FMLA leave because [he] failed to convey any information regarding the nature of [his] medical problem." *Phillips v. Quebecor World RAI, Inc.,* 450 F.3d 308, 312 (7th Cir. 2006) (citation and internal quotations omitted); *see Burnett,* 472 F.3d at 479 ("an employee's bare assertion that he is 'sick' is insufficient"); *Aubuchon v. Klaus*

*Fiberglass, GmbH*, 359 F.3d 950, 952 (7th Cir. 2004) ("If you have brain cancer but just tell your employer that you have a headache, you have not given the notice that the [FMLA] requires."); *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008-09 (7th Cir. 2001) ("A reference to being 'sick' not only withheld important information from the employer but likely threw it off the scent. Certainly it did not suggest to the employer that the medical condition might be serious or that the FMLA otherwise could be applicable."). "Requiring employers to determine whether leave is covered by the FMLA every time an employee was absent because of sickness would impose a substantial and largely wasted investigative burden on employers." *Phillips*, 450 F.3d at 312 (citation and internal quotations omitted). "The FMLA does not require employers to play Sherlock Holmes, scanning an employee's work history for clues as to the undisclosed, true reason for an employee's absence." *de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 687 (7th Cir. 2008).

The facts presented do not indicate that Guernsey put the City on inquiry notice that he had an FMLA-qualifying event. While Guernsey maintains that he provided sufficient information because the City had known of his chronic pain and absences related to such pain for years, he gave the City only limited information about his absences. The doctor's notes did not address the nature of Guernsey's medical problems; rather, they merely indicate that

he was "ill," "seen" by a doctor, and/or should be "excused" from work.  (DE #34-3 at 1-3.)  Guernsey refused to provide more information about his absences in response to his supervisor's request.  After being treated for his last reported injury, Guernsey's doctor notified the City that Guernsey could return to full activity without limitations, and that no follow-up was necessary.  On January 16, 2013, Guernsey texted his supervisor that his back was "bothering" him, and requested the day off.  This information did not suggest to the City that Guernsey's health condition might be serious or that the FMLA otherwise could be applicable.  Because the information available to the City was insufficient to put the City on notice of a serious health condition, the Court will not consider whether the City failed in its duty to investigate and inquire into his need for FMLA leave.

Count II includes an allegation that the City failed to notify Guernsey of his rights and responsibilities under the FMLA.  The FMLA contains a notice provision requiring that employers "keep posted, in conspicuous places . . . a notice . . . setting forth excerpts from, or summaries of, the pertinent provisions of this subchapter and information pertaining to the filing of a charge." 29 U.S.C. § 2619.  The City argues that it provided proper notice regarding employees' rights and responsibilities under the FMLA.

Guernsey has not established that the City failed notify him of his rights and responsibilities under the FMLA.  It is

undisputed that the City handbook included information regarding FMLA leave, and referenced "intermittent leave."[6]   It is also undisputed that the Federal Complete Compliance Poster was posted in the Street Department garage.   The poster addressed provisions of the FMLA and stated in part, "[a]n employee does not need to use [the FMLA] leave entitlement in one block.   Leave can be taken intermittently or on a reduced leave schedule when medically necessary."   (DE #34-9.)   The parties do not dispute that Guernsey had notice of both the City handbook and the poster.   In addition, Guernsey was aware of FMLA leave, as he had taken such leave twice before.   The Court finds that no genuine issues of material fact exist as to whether Guernsey was notified of his rights and responsibilities under the FMLA.   *See, e.g., Resler v. Koyo Bearings USA LLC*, No. 1:12-cv-100, 2014 WL 1272114, at *10 (M.D. Ga. Mar. 27, 2014) (granting summary judgment on FMLA notice claims where plaintiff did not dispute that FMLA procedures were printed in the employee handbooks and posted in the employee cafeteria). For the reasons set forth above, the Court grants the City's motion for summary judgment as to Count II.

---

[6] Count II also alleges that the City handbook was "not clear regarding intermittent FMLA leave being authorized."   (DE #19 at 4.) However, the FMLA section of the City handbook states that "[w]hen intermittent leave is sought, the certification must recite the anticipated dates and duration of treatment, if possible."   (DE #34-25 at 2.)   The Court finds that the City handbook indicates that intermittent FMLA leave may be authorized because it addresses the process for seeking such leave.

<u>COBRA Claim</u>

Count III of the Amended Complaint alleges that the City failed to provide Guernsey with timely notice of his right to elect to continue his health, vision, and dental insurance under COBRA. Guernsey moves for summary judgment on the issue of the City's liability under Count III, and for a hearing on the issue of penalties, damages, attorney fees and costs related to such violation.

COBRA requires that an employer notify the benefit plan administrator that an employee has experienced a "qualifying event" within 30 days of that event. 29 U.S.C. § 1166(a)(2). Within 14 days of that notification, the plan administrator must send a notice to the employee advising of his rights to elect to continue his insurance benefits for up to 18 months ("election notice"). 29 U.S.C. § 1166(a)(4)(A); 29 U.S.C. § 1166(c); *see* 29 C.F.R. § 2590.606-4(b)(2) (where an employer is the plan administrator, it must provide the election notice within 44 days of the date of the qualifying event). A "qualifying event" includes "any of the following events which, but for the continuation coverage required under this part, would result in the loss of coverage of a qualified beneficiary: . . . (2) The termination . . . of the covered employee's employment." 29 U.S.C. § 1163. The employee has 60 days from the date on which coverage terminated by reason of a qualifying event, or the date on which

he received the election notice, to elect to continue his insurance. 29 U.S.C. § 1165(a)(1). The "maximum required period" that continuing coverage must be offered is ordinarily 18 months after the date of the qualifying event. 29 U.S.C. § 1162(2)(A)(i).

Here, the City terminated Guernsey's employment effective February 1, 2013, but did not terminate his insurance benefits until June 21, 2013. The City notified IACT (the plan administrator) of the termination of Guernsey's employment and benefits on June 21, 2013. IACT then contacted United Healthcare to terminate Guernsey's insurance benefits as of June 21, 2013. United Healthcare provided Guernsey with his election notice on August 23, 2013, and gave him until October 24, 2013, to decide whether to elect to continue his insurance coverage.

The City argues that because Guernsey's termination of employment did not result in the loss of his insurance, the "qualifying event" that triggered the election notice requirement did not occur until June 21, 2013, when Guernsey's insurance was terminated. In support, the City relies on the language of COBRA that states that a "qualifying event" is an event which, "*but for the continuation coverage required under this part*, would result in the loss of coverage of a qualified beneficiary." 29 U.S.C. § 1163 (emphasis added). The City admits that the express language of COBRA does not provide guidance in determining a qualifying

event where the termination of employment does not coincide with the termination of the employee's insurance coverage.

Guernsey argues that his "qualifying event" occurred on the date of his termination, and that the City's duty to notify the plan administrator arose on that date. In support, Guernsey cites *Fama v. Design Assistance Corporation*, 520 Fed. Appx. 119 (3d Cir. 2013). In that case, the employee Fama terminated her employment in September 2008, and the employer mistakenly continued to pay for her insurance coverage until some point thereafter. *Id*. at 121. Fama did not receive an election notice until September 2009. *Id*. In deciding whether the COBRA notice provision had been violated, the Third Circuit looked to the Code of Federal Regulations, which explains that "[t]he end of the maximum [COBRA] coverage period is measured from the date of the qualifying event *even if the qualifying event does not result in a loss of coverage under the plan until a later date*." *Id*. at 123 (quoting 26 C.F.R. § 54.4980B-7 (A-4)(b)(1)) (emphasis in original). The C.F.R. also provides the following example:

> An employee who is covered by a group health plan terminates employment . . . and, beginning with the day after the last day of employment, is given 3 months of employer-paid coverage under the same terms and conditions as before that date. At the end of the three months, the coverage terminates.
> [] The loss of coverage at the end of the three months results from the termination of employment and, thus, *the termination of employment is a qualifying event*.

26 C.F.R. § 54.4980B-4(A-1)(g) (Example 1) (emphasis added). The Third Circuit explained that "the statute, the regulations, and the preceding example compel the conclusion that, in order to constitute a qualifying event, coverage must be lost either at the time of the qualifying event, or at some point within the eighteen-month maximum coverage period" of COBRA. *Fama,* 520 Fed. Appx. at 123 (citations omitted).  It held that the "qualifying event" was the date that Fama's employment terminated, and affirmed the district court's award of a statutory penalty of $10 per day between the date the employer should have provided Fama's election notice (44 days after the "qualifying event" of termination of employment) and the date Fama was provided the election notice. *Id*. at 122-24; *see also Sluka v. Landau Uniforms, Inc.,* 383 F. Supp. 2d 649, 659 & n.8 (D.N.J. 2005) (awarding statutory penalty of $20 per day for failure to notify employee of right to elect COBRA coverage even though lack of notice "appears to be an honest error" and defendant-employer "has offered to make Plaintiff whole by making coverage retroactive").

While *Fama* is an unpublished decision, and is not binding on this Court, the regulations and example cited in *Fama* are persuasive.  The Court finds the instant case to be similar to the example in 26 C.F.R. section 54.4980B-4(g).  Here, Guernsey received insurance coverage for approximately five months after the termination of his employment, and the loss of his coverage

resulted from the termination of his employment.  As such, the Court finds that the termination of Guernsey's employment on February 1, 2013, was the "qualifying event" under COBRA.  Because the City did not notify IACT until June 21, 2013, it failed to notify IACT of this qualifying event within the requisite 30 days.  *See* 29 U.S.C. § 1166(a)(2).

The City also argues that, regardless of when the "qualifying event" occurred, summary judgment on Count III is appropriate because Guernsey asserts his COBRA claim against the wrong defendant.  "It is well-established that in . . . COBRA-related disputes about the duties of the Plan Administrator, the proper defendant is the Plan Administrator." *Thurston v. Borden Waste-Away Serv., Inc.,* No. 3:96-CV-674RP, 1998 WL 456441, at *11 (N.D. Ind. May 19, 1998).  Relying solely on *Thurston*, the City insists that IACT as the plan administrator owed a duty to Guernsey, and that the City cannot be liable to Guernsey for any alleged failure of IACT.  *Thurston* did not address the issue here, where an employer failed to notify the plan administrator of the qualifying event within the time period required by Section 1166(a)(2).

Guernsey asserts that the City cannot avoid its duties to provide a COBRA election notice by hiring a plan administrator.  In support, he cites case law addressing the role of third party administrators ("TPA").  But a plan administrator is not the same as a TPA.  COBRA defines "administrator" as "the person

specifically so designated by the terms of the instrument under which the plan is operated." 29 U.S.C. § 1002(16)(A)(i). A plan administrator has certain obligations under COBRA. *See, e.g.,* 29 U.S.C. § 1166(a)(4)(A). While a plan administrator may hire a TPA to perform some notification services, "[t]he use of a TPA cannot shield the administrator from liability for violations of COBRA's notification requirements." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 590 (7th Cir. 2011); *see Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1231 (11th Cir. 2002) ("Simply hiring an agent and then instructing the agent to send notice is not sufficient to satisfy the statute. . . ."). Here, it is undisputed that IACT was the plan administrator for the City's benefit plan, rather than a TPA. Therefore, the Court does not find the cases cited by Guernsey to be persuasive.

Guernsey maintains that failing to provide a COBRA election notice within the requisite time period "subjects employers to a penalty . . . and may subject them to payment of the cost of medical expenses incurred." (DE #33-1 at 4.) While Guernsey cites 29 U.S.C. section 1132(c)(1) and 29 C.F.R. section 2575.502c-1 in support of this proposition, neither imposes penalties on employers. Rather, the plain language of Section 1132(c)(1) states that

> [a]ny *administrator* (A) who fails to meet [COBRA's notice requirements under 29 U.S.C. § 1166(a)(4)] . . . with respect to a participant or beneficiary . . . may

> in the court's discretion be personally liable to such
> participant or beneficiary in the amount of up to $100
> a day from the date of such failure . . . , and the court
> may in its discretion order such other relief as it deems
> proper.

29 U.S.C. § 1132(c)(1) (emphasis added); *see* 29 C.F.R. § 2575.502c-1 (increasing the maximum fine for a violation of Section 1132(c)(1) from $100 to $110 per day). Section "1132(c) does not impose a penalty upon an employer for failing to meet its obligations to notify the plan administrator of a qualifying event." *Alexander v. HE & M, Inc.,* No. CIV-10-212, 2011 WL 255285, at *2 (E.D. Okla. Jan. 25, 2011). It is undisputed that IACT, and not the City, is the plan administrator here. Thus, Section 1132(c) does not apply to the City.

The Court notes that employers have been found liable for failing to satisfy their obligation to notify the plan administrators of the occurrence of a qualifying event under 29 U.S.C. section 1166(a)(2). *See, e.g., Uthell v. Mid-Illinois Concrete, Inc*., No. 05-4034, 2006 WL 3590288, at *7 (S.D. Ill. Dec. 11, 2006) (where employer failed to give 29 U.S.C. § 1166(a)(2)'s required notice of a qualifying event to the plan administrator, the employer was solely liable for the benefits that employee would have received if he had received his election notice); *Ward v. Bethenergy Mines, Inc.,* 851 F. Supp. 235, 240 (S.D.W. Va. 1994) (finding employer liable for medical expenses incurred by a plan participant as a result of the employer's

failure to notify plan administrator of qualifying event). The Fifth Circuit has explained: "[a]s a result of section 1166(a)(2), [the employer] obviously had a responsibility to notify the plan administrator of the occurrence of a qualifying event. Thus [the employer] bore some notification burden in addition to its responsibility to provide continuation coverage." *Kidder v. H & B Marine Inc.*, 932 F.2d 347, 355 (5th Cir. 1991) (holding the employer liable for damages). Here, the City had a responsibility to notify IACT of the "qualifying event" of Guernsey's termination of employment within 30 days, as required by Section 1166(a)(2). Because the City failed to do so, it is a proper defendant of Count III.

Finally, the City argues that Guernsey's alleged damages – characterized as the loss of his COBRA insurance benefits – were not the result of the City's actions or inactions. Under COBRA, a qualified beneficiary must pay the applicable premium in a timely manner or risk losing coverage. *See* 29 U.S.C. § 1162(2)(C). It is undisputed that Guernsey's COBRA insurance coverage was canceled due to his failure to pay the insurance premiums. Guernsey does not proffer any evidence to show that the City caused the termination of his COBRA insurance coverage, or caused any other damage or injury to Guernsey. Rather, Guernsey responds in two sentences, arguing that statutory penalties may be assessed "regardless of the presence of or lack of damages to the employee.

Thus the mere absence of damages or lack of 'causation' of damages does not entitle [the City] to summary judgment on this issue." (DE #40 at 9.) However, since statutory penalties under Section 1132 are only available against the plan administrator and not the employer, Guernsey is not entitled to any statutory damages. *Rinaldo v. Grand Union Co.*, No. CV-89-3850, 1995 WL 116418, at *2 (E.D.N.Y. Mar. 8, 1995) (citations omitted).

Summary judgment is the "'put up or shut up' moment in litigation, by which we mean that the non-moving party is required to marshal and present the court with the evidence [he] contends will prove [his] case." *Goodman,* 621 F.3d at 654. Here, Guernsey fails to provide any evidence of an injury or damages incurred due to the City's failure to notify IACT of the "qualifying event" of his termination. The absence of damages entitles the City to summary judgment, despite its technical violation of Section 1166(a)(2). *See Rinaldo*, 1995 WL 116418, at *1 (granting summary judgment "since the plaintiff suffered no actual damages as a result of this technical violation [of COBRA notice requirements] and since punitive and statutory damages are not available"). Therefore, the City's motion for summary judgment on Count III is granted.

CONCLUSION

For the reasons set forth above, the City's motion for summary judgment (DE #31) is **GRANTED,** and Guernsey's motion for summary judgment (DE #33) is **DENIED.** The Clerk is **ORDERED** to **DISMISS** this case **WITH PREJUDICE**.


DATED:  August 12, 2016          /s/ RUDY LOZANO, Judge
                                 **United States District Court**